**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

BRYCE WATKINS,

     Plaintiff,

v.

DOUGLAS COUNTY, COLORADO;
BRIAN WUNDERLICH, in his individual capacity;
KEVIN NICHOLS, in his individual capacity; and
TAMMY BLACK, in her individual capacity,

     Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, Bryce Watkins, through his attorneys, Michael P. Fairhurst and David A. Lane of KILLMER, LANE & NEWMAN, LLP, brings this Complaint and Jury Demand against Defendants Douglas County, Colorado, Brian Wunderlich, Kevin Nichols, and Tammy Black, and states as follows in support:

## I. INTRODUCTION

1. Under the Fourth Amendment to the United States Constitution, "a man's home is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown." *Georgia v. Randolph*, 547 U.S. 103, 126 (2006) (alterations in original) (internal quotation marks omitted). "We have … lived our whole national history with an understanding of [that adage]." *Id*.

2. The Douglas County Sheriff's Office ("DCSO") Defendants, however, disregarded this and other clearly established law that lies at the core of the Fourth Amendment's protections by arbitrarily storming into Plaintiff Bryce Watkins' home without a search warrant,

and then unjustifiably beating him inside, despite lacking any circumstances, exigent or otherwise, to justify their objectively unreasonable conduct.

3.     A state of Colorado district court judge has already determined that Defendants Wunderlich, Nichols, and Black illegally entered Mr. Watkins' home in violation of his Fourth Amendment rights, and granted his motion to suppress evidence that the Defendants unlawfully obtained.

4.     Now, Mr. Watkins brings this civil action against the Defendants for DCSO's intentional violations of his constitutional rights to be free from excessive force and unreasonable invasions of his home.

## II.     JURISDICTION AND VENUE

5.     This action arises under the Constitution and laws of the United States and the State of Colorado and is brought pursuant to Title 42 U.S.C. § 1983.

6.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

7.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants reside in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## III.     PARTIES

**Plaintiff**

8.     Plaintiff Bryce Watkins is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in Douglas County in the State of Colorado.

**Defendants**

9.      Defendant Douglas County, Colorado is responsible for the supervision, training, official polices, customs, and actual practices of the Douglas County Sheriff's Office.

10.     Defendant Sergeant Brian Wunderlich is a citizen of the United States and a resident of and domiciled in the State of Colorado. At all times relevant to the claims against him, Defendant Wunderlich was acting under color of state law as an employee DCSO. At all relevant times, Defendant Wunderlich was responsible for the supervision, training, and discipline of his subordinate officers, including Defendants Black and Nichols here. Defendant Wunderlich personally participated in the deficient training, supervision, and discipline of his DCSO subordinates described herein.

11.     Defendant Deputy Kevin Nichols is a citizen of the United States and a resident of and domiciled in the State of Colorado. At all times relevant to the claims against him, Defendant Nichols was acting under color of state law as a DCSO deputy.

12.     Defendant Deputy Tammy Black is a citizen of the United States and a resident of and domiciled in the State of Colorado. At all times relevant to the claims against her, Defendant Black was acting under color of state law as a DCSO deputy.

## IV.      FACTUAL ALLEGATIONS

13.     On April 29, 2018, the Defendants illegally entered and rummaged around Mr. Watkins' home multiple times.

14.     The Defendants also unjustifiably beat Mr. Watkins inside his own home.

15.     No exigency or other legal basis supported any of the Defendants' warrantless invasions of Mr. Watkins' home and Mr. Watkins' privacy.

16.     Mr. Watkins did nothing that justified any use of force against him either, much less the violent body slams, choke holds, and excessively tight handcuffs to which the Defendants deliberately subjected him.

17.     The circumstances surrounding Defendants' unconstitutional home raid and beatdown of Mr. Watkins follow.

**Facts Gathered by the Defendants Before Entering Mr. Watkins' Home**

18.     On the evening of April 28, 2018, Mr. Watkins' wife at the time filed a police report alleging that she and Mr. Watkins had been involved in a domestic violence incident on the morning of April 28. The police were unable to contact Mr. Watkins on April 28.

19.     No law enforcement officer attempted to obtain a search warrant for Mr. Watkins' home on April 28 or April 29 despite having ample time to request one.

20.     About 24 hours after the reported altercation between Mr. and Ms. Watkins, Ms. Watkins contacted the DSCO and stated that Mr. Watkins had recently arrived home.

21.     Soon afterwards, Defendants Nichols, Black, and Wunderlich were dispatched to the Watkins' residence to follow up on the April 28 domestic violence report. They arrived in separate patrol vehicles at about 930am on April 29.

22.     Ms. Watkins was standing safely outside in a park near Mr. Watkins' home when Defendant Nichols arrived on scene.

23.     Defendant Deputy Nichols and Ms. Watkins spoke while they were in the park together.

24.     Ms. Watkins identified Mr. Watkins' home and told Nichols that she and Mr. Watkins live there together.

25.     Ms. Watkins also told Nichols that there were not any firearms in the home.

26.     During Defendant Nichols' conversation with Ms. Watkins in the park, Mr. Watkins called her phone, and Nichols answered it.

27.     Defendant Nichols asked Mr. Watkins to come out of the house to speak with deputies. Mr. Watkins refused. Mr. Watkins instead clearly communicated to Defendant Nichols that law enforcement **could not** enter his home without a search warrant.

28.     Defendant Nichols reported on his police radio (which at least Defendants Black and Wunderlich could hear at the time) that he just talked with Mr. Watkins, that Mr. Watkins was refusing to come to the door, that Mr. Watkins stated he was going to take a shower, and that Mr. Watkins hung up on him (Nichols).

29.     Thus, it was apparent to all the Defendants – before any Defendant entered Mr. Watkins' home – that Mr. Watkins unequivocally **did not consent** to law enforcement entering his home.

30.     Immediately after the call with Mr. Watkins, Defendant Nichols told Ms. Watkins that sheriffs were going to have to enter Mr. Watkins' home because he was refusing to come outside. This laid bare his illegal plan to invade Mr. Watkins' home simply because Mr. Watkins had stated that he was not going to leave his home.

31.     Likewise, when Nichols reported to Black and Wunderlich over the radio that Mr. Watkins refused to speak with law enforcement and stated that he was about to get into the shower, Wunderlich told Nichols to tell Mr. Watkins to not get into the shower and to "tell him we're gonna come in." Defendant Sergeant Wunderlich was the supervisor on scene, by virtue of his senior rank.

32.     Though Mr. Watkins had a clearly established constitutional right to refuse to leave his home and to stay in his home without the police invading it, this made no difference to the Defendants.

33.     Because Mr. Watkins had stated that he would not come out of his house, the Defendants decided to storm into his home, almost immediately.

34.     Before leaving the park, Defendant Nichols also asked Ms. Watkins if there was a garage code, and she stated that there was and gave him the code. Ms. Watkins told Nichols that this same code would open the front door.

35.     Defendant Nichols relayed the garage code to Defendants Black and Wunderlich over the police radio.

36.     He further stated on the radio that there were no guns inside Mr. Watkins' home.

37.     Based on information gathered during his investigation into the Watkins case, and before entering Mr. Watkins' home, Defendant Nichols also knew that:

    a.     Ms. Watkins was safe on the morning of April 29, as she was outside in a park, far away from Mr. Watkins, with sheriffs in close proximity to her.

    b.     Mr. Watkins had never before been arrested for or charged with, much less convicted of, *any* violent criminal offense.

    c.     There was no particularized reason to believe that Mr. Watkins would seek to destroy or conceal any evidence inside his home.

    d.     There was no factual basis upon which to conclude that Mr. Watkins posed an immediate threat to himself or others.

    e.     There was no evidence that anyone besides Mr. Watkins was in the house on the morning of April 29

  f. There was no other conceivably emergent or exigent circumstance in Mr. Watkins' home.

  g. Mr. Watkins was a tenant of the home who had an enforceable right, under the circumstances, to not consent to the police entering his home.

38. Once Defendant Nichols ended his conversation with Ms. Watkins, he reentered his patrol vehicle and drove the short distance to Mr. Watkins' house.

39. He reported on the radio to his Co-Defendants that he was heading to Mr. Watkins' home, and that Ms. Watkins was going to remain in the park.

40. Defendants Black and Wunderlich were standing just outside Mr. Watkins' house when Nichols arrived there.

41. Defendant Deputy Black had already tried to open the front door using the code Ms. Watkins provided but had been unable to do so.

42. Wunderlich had already tried to open the garage door using the code Ms. Watkins provided but had been unable to do so.

43. Defendant Nichols went onto the front porch. Defendant Black was already standing on the front porch near the front door.

44. Soon after Defendant Nichols joined Black on the front porch, both he and Black intentionally muted their bodycams.

45. For the next minute or so, Nichols and Black conversed, but what exactly they said is unknown as both of these Defendants deliberately covered it up, and Defendant Wunderlich was too far away from the conversation of Nichols and Black to fully capture it on his own body cam.

46.     When the audio resumed on Nichol's body cam footage, he stated something to the effect of "I didn't ask for that to be honest with you." Based on Wunderlich's body cam footage, Nichols said this in response to Wunderlich asking him whether Ms. Watkins explicitly gave law enforcement permission to enter the home.

47.     Thus, all the Defendants knew that even Ms. Watkins had **not** given the police permission to enter Mr. Watkins' home before any Defendant entered Mr. Watkins' home.

48.     Nichols then attempted to unlock the front door using the code that Ms. Watkins had given him, but it did not unlock the lock the door, and he told Black that it was not working.

49.     In response, Black stated that they should enter the home with their less lethal weapons (i.e., tasers) drawn.

50.     Like Nichols and Wunderlich had previously done, Black therefore put words to her (blatantly illegal) belief that Mr. Watkins refusing to come out of his own home justified an imminent law enforcement raid of his home.

51.     While still on the front porch, Black and Nichols also discussed the possibility that Mr. Watkins may have intentionally changed the code in order to stop them from entering his home. This supplies even more proof that they knew that Mr. Watkins did not consent to the police coming into his house.

52.     At no point when Black and Nichols were standing right next to the front door together did they so much as knock on the door or otherwise audibly announce their presence to Mr. Watkins.

53.     As such, Mr. Watkins (who was inside his house taking a shower upstairs) had no idea that the police were on his front porch and trying to break into his home.

54.     Defendant Wunderlich meanwhile stood outside Mr. Watkins' garage.

55.     Defendants Black and Nichols left the front porch walked over to Wunderlich.

56.     Defendant Nichols entered the code Ms. Watkins had given him into the garage door keypad.

57.     It worked – and the door opened.

58.     The garage manifestly was part of Mr. Watkins' home; it was fully encompassed and enclosed by the walls and roof of Mr. Watkins' house where he resided, and there were two cars and numerous other personal effects inside. The garage was not semi-detached or detached from the house.

**Defendants Nichols and Black Illegally Enter Mr. Watkins' Home Through the Garage. Defendant Supervisor Wunderlich Watches His Subordinates Invade Mr. Watkins' Home but Does Nothing to Stop Them. Wunderlich Instead Illegally Enters the Garage Himself.**

59.     Defendants Nichols and Black entered Mr. Watkins' garage with their tasers drawn.

60.     Defendant Wunderlich watched this illegal home invasion unfold but failed to immediately stop it, despite having the opportunity to do so.

61.     As Defendants Nichols and Black prepared (with weapons drawn) to open the door into the next room in Mr. Watkins house, Wunderlich asked if Ms. Watkins had given them permission to go inside.

62.     Defendant Nichols again told Wunderlich that she had not explicitly given law enforcement permission to enter the home (he had said the same thing to Black and Wunderlich earlier when he was standing on the front porch).

63.     Nichols then went back outside by passing underneath the open garage door, in order to speak with Ms. Watkins again.

64.     Meanwhile, Black remained inside the garage.

65.     Wunderlich did not say or do anything to stop Black from continuing to illegally occupy Mr. Watkins' home.

66.     Defendant Wunderlich instead crossed the threshold between the garage and exterior into Mr. Watkins' home himself. Therefore, Wunderlich illegally entered Mr. Watkins' home as well.

67.     Through their communications with Defendant Nichols, and their own independent knowledge of the April 28 report of Ms. Watkins, neither Defendant Wunderlich nor Black were aware of any facts indicating that an exigency existed inside Mr. Watkins' home on the morning of April 29. Conversely:

    a.  They knew that the reported altercation between Mr. Watkins and his wife had occurred more than a day ago.

    b.  They knew Ms. Watkins was outside the home at the time, and that she was safe in a nearby park.

    c.  They had no reason to believe that anyone was inside Mr. Watkins' home besides Mr. Watkins.

    d.  They had no reason to believe that anyone was in danger inside Mr. Watkins' home.

    e.  They observed that Mr. Watkins' house was quiet and peaceful, as no sounds were emanating from the interior and no one was visible inside.

    f.  They had no reason to believe that anyone was seeking to destroy evidence inside the home.

68.     Moreover, Wunderlich and Black (like Nichols) had no reason to believe that Mr. Watkins had consented to the police entering his home. Rather, Defendants Wunderlich and Black knew that Mr. Watkins had clearly refused to consent to law enforcement entering his home during his recent

phone conversation with Defendant Nichols. They knew that Mr. Watkins was a co-tenant of the home who had an enforceable right, under the circumstances, to not consent to the police entering his home.

69.     Before Nichols left the premises to return to the nearby park, Defendant Wunderlich told Defendant Nichols to place a trash can next to the garage door sensor so that it would stay open – still lacking a search warrant, and still lacking consent from any owner of the house.

70.     Defendant Nichols dragged over a trash can to hold open the garage door to Mr. Watkins' house.

71.     Defendant Nichols then walked back to the park to ask Ms. Watkins if she would consent to the deputies' entry to the home. She said that she did. She also explicitly stated that she and Mr. Watkins both owned the home.

72.     After Defendant Nichols returned to the garage, he reported that Ms. Watkins had given them permission to enter the home. He said nothing about Mr. Watkins revoking his non-consent.

73.     Of course, Defendant Nichols still knew that Mr. Watkins had refused to consent to the police entering his home just a few minutes earlier. So did Defendants Black and Wunderlich.

### **Defendants Wunderlich, Nichols, and Black Storm into the Living Area of Mr. Watkins' Home Despite Lacking Mr. Watkins' Consent, a Search Warrant, or an Exigency.**

74.     Defendant Nichols immediately entered the home via the garage and joined Black, who had already been lurking in there for a while.

75.     Nichols led the charge into the living area of Mr. Watkins' home. He opened the closed door separating the garage and laundry room and went into the laundry room. Black followed close behind him.

76.     Black and Nichols then went through Mr. Watkins' kitchen area to a staircase that led to the second floor.

77.     Once they were inside Mr. Watkins' home, Defendants Nichols and Black started loudly announcing that the sheriff's office was there and demanding that Watkins immediately come out and talk with them.

78.     Defendant Wunderlich entered Mr. Watkins' home through the front door around the time that Nichols and Black arrived at the base of the staircase.

79.     Mr. Watkins was upstairs in the bathroom, heard the loud commands of unexpected home intruders, quickly exited the shower, wrapped himself in a towel and came partway down the stairs.

80.     Mr. Watkins was surprised, terrified, and bewildered – and repeatedly asked what was going on.

81.     Mr. Watkins clearly was unarmed and nonthreatening.

82.     Defendants Nichols and Black commanded Mr. Watkins to immediately come the rest of the way down to the first floor.

83.     At least Nichols and Black had their tasers drawn by the time Mr. Watkins first saw them in his house from partway up the stairs. The tasers looked like handguns and added to the abject terror and shock that Mr. Watkins was experiencing.

**Defendants Wunderlich, Nichols, and Black Beat and Terrorized Mr. Watkins Without Justification Inside His Own Home.**

84.     Nichols and Black then proceeded to point their weapons straight at Mr. Watkins, which further compounded his terror.

85.     Mr. Watkins kept exclaiming "this is my house!" Mr. Watkins also explained that he was a co-owner of the home. This yet again made it clear to all of the Defendants that he was not consenting to law enforcement being inside and that he had the authority to keep the police out of his home under the circumstances. Making his non-consent clearer still, one of the Defendants (believed to be Nichols) stated that Ms. Watkins had given the police permission to enter the home. Mr. Watkins immediately asserted "No!".

86.     However, none of this deterred any of the Defendants from continuing to occupy Mr. Watkins home – with their weapons trained on him.

87.     Soon after Mr. Watkins first saw the Defendants, he complied with their commands for him to come down the stairs and descended to the base of his staircase. He continued to ask the Defendants for an explanation about what was going on. They failed to provide one and thereby needlessly escalated the situation.

88.     Then, Mr. Watkins stepped back from the Defendants while still facing them, with his back turned to the second floor.

89.     Mr. Watkins did nothing that was threatening.

90.     Mr. Watkins did nothing indicating that he was attempting to flee (obviously, no one who legitimately wanted to flee from a scene would do it by taking a step or two up a staircase that leads to their bedroom).

91.     Mr. Watkins clearly was just confused, stunned, and fearful for his life. The Defendants intensified his terror by refusing to even explain to Mr. Watkins why they had illegally broken into his house and were now pointing their weapons at him.

92.     Almost instantaneously after Mr. Watkins took a few steps backwards, Deputy Nichols grabbed and tackled him, throwing Mr. Watkins down hard to the ground with his back pointed towards the stairs.

93.     At about the same time, Nichols clenched Mr. Watkins' neck with one of his hands and began to intentionally choke him.

94.     Mr. Watkins was by this point petrified and confused beyond belief. Law enforcement had entered the sanctity of his home unlawfully, pointed weapons at him for no reason, and attacked him, including a large male officer putting his hand around Mr. Watkins' throat.

95.     Consequently, Mr. Watkins reflexively tried to retreat up the stairs.

96.     This was a reasonable decision under the circumstances. Mr. Watkins had a right to defend his house by using deadly force against the Defendants because they had all invaded his home unlawfully. Mr. Watkins was therefore well within his rights when he nonthreateningly tried to get away from the Defendants while still remaining in his own home. The Defendants clearly were intent on beating him without justification; as such, trying to get away from them was a logical and lawful decision.

97.     Despite this, Nichols, Wunderlich, and Black, acting in concert, immediately chased Mr. Watkins up the stairs and deliberately slammed him down very hard to the ground, face first, while he was still on the stairs. This caused serious pain to Mr. Watkins.

98.     Mr. Watkins suffered the additional profound indignity of his towel falling off his body during this time. He was now completely naked. The Defendants' brazen invasion of his privacy inside his own home was nothing short of remarkable.

99.     Defendants Nichols, Wunderlich, and Black, acting in concert, continued to brutalize Mr. Watkins once he was on the ground (and naked).

100.    For example, Wunderlich put Mr. Watkins in a headlock and started choking him. He also placed a taser in his back and threatened to deploy it if he did not stop resisting (though Mr. Watkins was clearly not resisting at the time).

101.    Black pointed her taser at Mr. Watkins' naked back as well, including after he was handcuffed, which Mr. Watkins observed in terror.

102.    Nichols then intentionally excessively tightly handcuffed Mr. Watkins hands behind his back, while he was still lying naked on the staircase. This caused significant pain to Mr. Watkins' wrists.

103.    At no relevant time did Mr. Watkins threaten any Defendant.

104.    At no relevant time did Mr. Watkins attempt to physically harm any Defendants.

105.    At no relevant time did Mr. Watkins refuse to comply with an enforceable command.

106.    At no relevant time did Mr. Watkins resist arrest.

107.    At no relevant time did Mr. Watkins even attempt to leave his own house.

108.    At no relevant time did any Defendant try to intervene to stop their co-Defendants from subjecting Mr. Watkins to excessive force, despite having the opportunity to do so.

109.    Eventually, Wunderlich retrieved clothes for Mr. Watkins and Nichols put pants on him.

110.    The Defendants then escorted Mr. Watkins, still shirtless and shoeless, to an awaiting patrol car in front of his on-looking neighbors and his prospective work clients. Yet again, the Defendants unnecessarily humiliated Mr. Watkins at his home.

**Defendants Black and Nichols Illegally Enter Mr. Watkins' Home Again. Defendant Supervisor Wunderlich Does Nothing to Stop His Subordinates' Illegal Home Entries Again.**

111.    After Mr. Watkins was in police custody, Defendant Black went back into Mr. Watkins house without a search warrant. She still knew that Mr. Watkins had expressly refused to permit law enforcement to enter his house, and that there was no exigency.

112.    She took pictures of his staircase.

113.    Defendant Black left the house and then went back in yet again to obtain clothes, a cell phone, and wallet for Mr. Watkins. Black also spoke with Ms. Watkins at length inside Mr. Watkins' home. For the reasons stated in, e.g., paragraph 111, Black still lacked legal justification for entering and remaining in Mr. Watkins' home.

114.    For his part, Defendant Nichols also reentered Mr. Watkins' home after he had been arrested and was in the patrol car by going into his garage without a search warrant. Wunderlich watched this illegal entry unfold but, of course, did nothing to try stop it even though he could have. Wunderlich and Black still knew that Mr. Watkins had expressly refused to permit law enforcement to enter his house, and that there was no exigency.

115.    Later that morning, Nichols went back into the living area portion of Mr. Watkins house to speak with Ms. Watkins and rummage around the staircase. He stayed inside for several minutes. For the reasons stated in, e.g., paragraph 114, Nichols still lacked legal justification for entering and remaining in the home.

116.    Mr. Watkins was eventually transported to the DCSO jail, where he was held for about 24 hours.

117.    As mentioned, the Defendants intentionally placed Mr. Watkins in excessively tight handcuffs. They then kept him excessively tightly cuffed for an extended period. Of

particular note, while Mr. Watkins was waiting to be booked as Defendant Black typed her police report, Mr. Watkins asked her repeatedly if someone could loosen his handcuffs because, as he explained, he was starting to lose feeling in his hands. Defendant Black intentionally took no action to ameliorate his reported pain and loss of circulation for over an hour. Mr. Watkins suffered visibly bruised wrists (and serious pain) from this excessive force.

118.     As of all of this was not already enough, the Defendants, acting in concert, deliberately fabricated evidence to support Mr. Watkins being charged with misdemeanor obstructing a police officer and assault on a peace officer based on his interactions with them inside his house. The Defendants' lies provided material support for these charges. The truth is, though, there clearly existed no probable cause or even arguable probable cause to charge Mr. Watkins with these offenses, as he clearly did not commit any crime during his interactions with the Defendants. The reasons for this are set forth above.

119.     The prosecution eventually dropped the manifestly bogus charges against Mr. Watkins based on his interactions with law enforcement, but not before Mr. Watkins incurred significant personal expense, stress, and anguish defending himself against it for over one year (with the aid of a private criminal defense attorney).

**District Court Judge Slade Holds That the Defendants Violated Mr. Watkins' Fourth Amendment Rights.**

120.     A neutral judge has already determined that the Defendants violated Mr. Watkins' rights by illegally entering his home, in violation of the Fourth Amendment to the United States Constitution.

121.     More specifically, 18th Judicial District Court Judge Theresa Slade granted Mr. Watkins' motion to suppress after an evidentiary hearing involving testimony by Deputy Nichols and presentation of body cam video.

122.    Judge Slade found that the Defendants entered the home without a search warrant, without valid consent, and without justification based on exigent circumstance, and therefore held: "I am finding that the officers did make an unlawful entry into the home and suppress evidence obtained following that entry and that starts from the garage."

123.    Judge Slade's holding was correct. Under clearly established Supreme Court law, when a co-tenant of the house, i.e. Mr. Watkins here, has refused to permit law enforcement to enter their home, it is unlawful for the police to enter the home without a search warrant or an exigent circumstance. *See, e.g., Georgia*, 547 U.S. at 115. "Disputed permission is . . . no match for this central value [of a person's house] of the Fourth Amendment[.]" *Id.*

124.    The Defendants violated this and other clearly established law.

125.    As a result of the Defendants' violations of his rights, Mr. Watkins has suffered significant physical and psychological harm.

**Defendants Douglas County and Wunderlich failed to properly train, supervise, and discipline DCSO personnel regarding the lawful basis for entering a person's home.**

126.    Defendants Douglas County and Wunderlich have failed to properly train, supervise, and discipline their subordinate employees and agents who participated in the aforementioned events, despite the obvious need for scrutiny in specialized training, supervision and discipline regarding such decisions, and the fact that their current custom, policies, and/or practices with respect to training, supervision, and discipline are clearly likely to result in a violation of constitutional rights.

127.    Defendant Wunderlich personally participated in this deficient training, supervision, and discipline of his DCSO subordinates, including Nichols and Black. These deficiencies existed at all relevant times – including well before April 2018  – and are exemplified by at least the following: the failure to appropriately train DCSO employees

regarding the bases for lawfully entering a person's home, the failure to utilize other appropriate training methodology with respect to DCSO employees as well (such as sufficiently regular stress inoculation training), the failure to provide or obtain appropriate medical care for individuals injured during an arrest, the failure to require DCSO employees to timely, accurately, or truthfully report their on-the-job conduct, the failure to properly investigate allegations of misconduct against DCSO employees, the failure to require DCSO employees to preserve evidence relating to allegations of DCSO misconduct, and the failure to suitably discipline DCSO employees who engaged in misconduct, including but not limited to unconstitutional entries and searches of homes and uses of force against individuals.

128.    Thus, Defendants Wunderlich and Douglas County had actual or constructive notice before April 2018 that their deficient customs, practices, and actual policies were substantially certain to result in constitutional violations of a similar nature to those Plaintiff suffered, and consciously and deliberately chose to disregard the risk of harm.

129.    The DCSO Sheriff and Defendant Wunderlich also ratified the individual Defendants' illegal entries into and searches of Plaintiff's home (and excessive use of force against Plaintiff inside) by being aware of their actions taken and the illegal bases for their actions, but nonetheless condoning and approving all of their actions. Such ratification demonstrates that the law enforcement conduct as described herein was engaged in pursuant to approved custom, policy and practice and was standard operating procedure in the Douglas County Sheriff's Office.

130.    At all relevant times, all the individual Defendants were acting consistent with and pursuant to the customs, policies, and practices of the DCSO.

131.    At all relevant times, all the individual Defendants were acting consistent with and pursuant to the training provided to them by the DCSO.

132.    Upon information and belief, the County failed to discipline or otherwise reprimand any of the individual Defendants for any of their conduct underlying Plaintiff's case.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### 42 U.S.C. § 1983 – Fourth Amendment Violation –
#### Unlawful Entry/Search
(Against Defendants Wunderlich, Nichols, and Black)

133.    Plaintiff hereby incorporates all other paragraphs of this Amended Complaint as if fully set forth herein.

134.    Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

135.    Plaintiff had a protected Fourth Amendment interest against unreasonable governmental intrusion into his home.

136.    Defendants Wunderlich, Nichols, and Black acting in concert with one another, entered and searched Plaintiff's home unlawfully.

137.    Defendants also failed to intervene despite an opportunity and obligation to do so to prevent violating Mr. Watkins' rights.

138.    No Defendant had a warrant authorizing any such search of Plaintiff's home.

139.    Plaintiff never consented to any Defendant's entry or search of his home.

140.    No legally recognizable circumstances, exigent or otherwise, existed which would have justified or permitted Defendants' conduct.

141.    Defendants' actions as described herein were objectively unreasonable in light of the circumstances confronting them.

142.    Defendants engaged in these actions intentionally, willfully, and wantonly.

143.    Defendants engaged in these actions with reckless or callous disregard of, or indifference to, the rights and safety of Plaintiff (and others).

144.    Plaintiff has been and continues to be damaged by Defendants' unreasonable searches because such searches caused and causes him severe mental and emotional distress.

145.    The acts or omissions of each Defendant were the legal and proximate cause of Plaintiff's damages.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Violation –
### Excessive Force
(Against Defendants Wunderlich, Nichols, and Black)

146.    Plaintiff hereby incorporates all other paragraphs of this Amended Complaint as if fully set forth herein.

147.    Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

148.    Plaintiff had a protected Fourth Amendment interest against excessive force at the hands of law enforcement personnel.

149.    Defendants Wunderlich, Nichols, and Black, acting in concert, unlawfully seized Plaintiff by means of excessive physical force.

150.    Defendants had no warrant authorizing any seizure of Plaintiff's person.

151.    No legally recognizable circumstances, exigent or otherwise, existed which would have justified or permitted Defendants' conduct.

152.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

153.    Defendants engaged in these actions intentionally, willfully, and wantonly.

154.    Defendants engaged in these actions with reckless or callous disregard of, or indifference to, the rights and safety of Plaintiff (and others).

155.    Plaintiff has been and continues to be damaged by Defendants' use of excessive force because such excessive force caused and causes him severe mental and emotional distress.

156.    The acts or omissions of each Defendant were the legal and proximate cause of Plaintiff's damages.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Violation –
### Unlawful Entry/Search – Supervisory and Municipal Liability
(Against Defendants Douglas County and Wunderlich)

157.    Defendant Douglas County and Defendant Wunderlich failed to properly train, supervise and discipline their employees and subordinate officers, respectively, regarding the proper basis for engaging in a search of a residence, which was a cause of the Defendants' unlawful search of Plaintiff's home.

158.    This inadequate training, supervision, and or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants Douglas County and Wunderlich.

159.    In light of the duties and responsibilities of Defendant Douglas County and Defendant Wunderlich's personnel – who must make decisions regarding when Fourth Amendment searches are appropriate –  the need for scrutiny in specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Douglas County is liable for its failure to properly train, supervise, and discipline its subordinate employees and agents. Defendant Wunderlich is liable for these reasons as well.

160.     Such failure to properly hire, train and supervise was the moving force behind and proximate cause of Defendants' unreasonable search of Plaintiff's home, and constitutes an unconstitutional policy, procedure, custom and/or practice.

161.     Defendants Douglas County and Wunderlich also ratified Black's, Nichols', and Wunderlich's unlawful entry and search of Plaintiff's home by being aware of the circumstances surrounding their illegal entry and search and approving of their actions without exception.

162.     Plaintiff has been and continues to be damaged by Defendants' unreasonable searches because such searches caused and causes him severe mental and emotional distress.

163.     The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Plaintiff's damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to the following:

    a.  Declaratory relief and injunctive relief, as appropriate;

    b.  Actual economic damages as established at trial;

    c.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

    d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

    e.  Pre-judgment and post-judgment interest at the highest lawful rate;

      f.   Attorney's fees and costs; and

      g.  Such further relief as justice and equity requires.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

      Dated this 27th day of April 2020.

                                KILLMER, LANE & NEWMAN, LLP

                                *s/ Michael Fairhurst*
                                Michael P. Fairhurst
                                David A. Lane
                                KILLMER, LANE & NEWMAN, LLP
                                1543 Champa Street, Suite 400
                                Denver, Colorado 80202
                                (303) 571-1000
                                (303) 571-1001-facsimile
                                mfairhurst@kln-law.com
                                dlane@kln-law.com

                                ATTORNEYS FOR PLAINTIFF